272 F.3d 116 (2nd Cir. 2001)
 UNITED STATES OF AMERICA, APPELLEE,
v.
JOHN DOE #1, CHARLTON WILLIAMS, SHAWN FINDLEY, KARL MICHAEL SMITH, SCOTT IAN MOREE, A.K.A. JOSEPH SKELLY, A.K.A. PAUL T. SALMON, A.K.A. KEVIN MOXAM, A.K.A. MARK A. BELL, A.K.A. FAT TONY, DEFENDANTS,
ANDREW K. FINDLEY, A.K.A. ROUNDHEAD, A.K.A. GILLY, DEFENDANT-APPELLANT.
 Docket No. 00-1224
August Term, 2000
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued: April 23, 2001
Decided: November 8, 2001
 
 Appeal from the judgment of conviction and sentence entered in the United States District Court for the District of Connecticut (Alan H. Nevas, Judge), on March 13, 2000, following a jury trial, for one count of conspiracy to possess with intent to distribute cocaine base, in violation of 21 U.S.C. § 846. and four counts of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1). On appeal, Findley contends that the district court erred in declining to substitute trial counsel despite alleged irreconcilable differences between Findley and his trial counsel, resulting in a deprivation of his Sixth Amendment right to effective assistance of counsel. AFFIRMED.[Copyrighted Material Omitted]
 Gary D. Weinberger, Assistant Federal Public Defender, Hartford, Connecticut (Thomas G. Dennis, Federal Public Defender, Dalit Yarden-Krug, Research and Writing Specialist, Office of the Federal Public Defender, Hartford, Connecticut, on the brief), for Defendant-Appellant.
 Christopher W. Schmeisser, Assistant United States Attorney, District of Connecticut, Bridgeport, Connecticut (Stephen C. Robinson, United States Attorney, District of Connecticut, Bridgeport, Connecticut, on the brief), for Appellee.
 Before: Jacobs, Parker, and Katzmann, Circuit Judges.
 
 Parker, Circuit Judge
 
 1
 Defendant-Appellant Andrew Findley appeals from the judgment of conviction and sentence entered in the United States District Court for the District of Connecticut (Alan H. Nevas, Judge). The district court declined to substitute Findley's trial counsel despite alleged irreconcilable differences between Findley and his counsel. Findley argues that the district court erroneously denied various motions by both Findley and Findley's trial counsel, Brian Stapleton, to withdraw and substitute counsel and that these denials resulted in a denial of Findley's Sixth Amendment right to effective assistance of counsel, demonstrated by the complete abandonment by counsel when Findley sought to testify on his own behalf. Findley seeks to reverse his conviction and receive a new trial.
 
 
 2
 For the following reasons, we find that the district court did not abuse its discretion in denying the motions to withdraw trial counsel and substitute counsel. We therefore affirm the decision of the district court.
 
 I. BACKGROUND
 
 3
 Between May and November 1997, the government conducted a narcotics investigation which included Findley as a subject. The government was assisted by a confidential informant who participated in recorded telephone conversations and drug transactions. In November 1997, agents of the Drug Enforcement Agency ("DEA") arrested Findley after he, on three different occasions, sold cocaine to the confidential informant. Findley was charged with one count of conspiracy to possess with intent to distribute cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846, and four counts of possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1).
 
 
 4
 After his arrest, Findley was represented by a court-appointed attorney who appeared only for the initial presentment. Thereafter, in December 1997, Findley retained Donald Richman, who worked on a proffer agreement with the government and who, in May 1998, withdrew as counsel and claimed that Findley would not communicate with him.[1] In July 1998, the court appointed Brian Stapleton to represent Findley pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A.
 
 
 5
 On January 29, 1999, days before jury selection was scheduled to commence, Stapleton moved to withdraw as counsel or, in the alternative, subject Findley to an examination to determine his competency to stand trial. Stapleton stated that:
 
 
 6
 Since the inception of my relationship with Mr. Findley, he has voiced an extremely aggressive distrust of my role in this case. Mr. Findley has made quite clear that he does not trust me and that he believes that I am an agent of the Government acting out my part in a large-scale conspiracy designed to "trick" Findley into being convicted. Mr. Findley has also repeatedly expressed his intense personal dislike for me and his apparently deep-seated belief that I am only involved in this case to "railroad" Mr. Findley into a conviction. In our recent conversations, the tone of Mr. Findley's communications has evolved from initially being extremely aggressive to now verging on uncontrollable violence.... [Findley] has repeatedly grown so agitated and hostile -- shouting, screaming, throwing papers from the counsel table and around the room, making intimidating approaches to counsel.... Mr. Findley has also made veiled threats to me... such that I now fear that, if Mr. Findley is convicted, he or his co-conspirators threaten my personal safety and possibly that of my family.
 
 
 7
 J.A. at 28-29 (paragraph numbers omitted). Stapleton also addressed Findley's competency to stand trial, stating that Findley may be "deeply paranoid and possibly delusional...." J.A. at 29.
 
 
 8
 The district court held a hearing on Stapleton's motion and, with Findley absent from the courtroom, heard from Stapleton concerning Findley's aggressive attitude, Findley's potential to disrupt the courtroom, and Stapleton's belief that Findley was potentially paranoid. The government concurred with Stapleton's concerns about Findley's competency. The district court stated that it would "deal with the issue here in open court and enter an order" sending Findley to undergo a thirty-day competency evaluation. Thereafter, Findley was brought into the courtroom and given an opportunity to speak to the court. Findley contended that Stapleton was a compulsive liar who could not be trusted. The district court responded that Stapleton was "one of the most competent criminal defense lawyers in [the] area.... He thinks that you've got some mental problems. I suspect you probably do. And the government has concurred in that application [for an examination]." The court then ordered a competency examination and denied Stapleton's motion to withdraw as counsel without prejudice to renewal. Jury selection was postponed.
 
 
 9
 Subsequently, psychologists at the Metropolitan Correctional Center examined Findley on three different occasions and ultimately determined that he was a "malingerer." Their report indicated that Findley was "describing himself as extremely disturbed and endorsing significantly more psychological symptoms than do most psychiatric patients," and concluded that Findley was deliberately attempting to appear more psychologically disturbed than he actually was. Therefore, Findley was deemed competent to stand trial.
 
 
 10
 In April 1999, Findley submitted a pro se motion to relieve Stapleton as trial counsel alleging that Stapleton harbored bad faith and failed to discuss defense strategies with Findley. The district court held a hearing on Findley's motion, during which Findley argued that there was a "conflict of interest" between him and Stapleton because Stapleton had repeatedly lied to him. In response, Stapleton indicated that he had had no communication with Findley since Findley's last appearance in court. Stapleton further stated that he had provided Findley with all discovery (which Findley disputed) and had given Findley a "candid estimation" of how the trial would proceed and end. Stapleton also described Findley's aggressiveness toward him, but expressed his willingness to continue to represent Findley, since he believed that Findley would act similarly with any other attorney. Ultimately, the district court denied Findley's motion, stating: "If I have to make a choice between believing what you tell me and believing what Mr. Stapleton tells me, I'm going to believe Mr. Stapleton. I don't believe you." J.A. at 61.
 
 
 11
 In June 1999, the parties convened for jury selection, during which Stapleton moved again to withdraw as Findley's counsel. Stapleton described Findley's threatening behavior and stated: "I'm going to move for the record one more time to withdraw because I cannot represent this man. He is impossible to deal with. He does not have a defense and he refuses to listen to reason. And he doesn't want me any more than I want him." J.A. at 76. Findley echoed Stapleton's request, contending that Stapleton had failed to appear for meetings, had failed to provide him with evidence and paperwork related to his case and had also lied. The district court stated to Findley, after hearing both Stapleton's and Findley's versions, "I'm going to believe Mr. Stapleton and I'm not going to believe you. You're not believable.... You're manipulative, you're difficult, you're obstreperous and you create bad feelings on the part of everybody who comes in contact with you." J.A. at 83. The district court denied Stapleton's renewed motion and concluded that Findley would cause similar difficulties with any lawyer appointed for him.[2]
 
 
 12
 Findley's trial commenced on June 21, 1999. On that first day, Stapleton notified the district judge that, during his visit with Findley the night before, a corrections officer had to restrain Findley from striking Stapleton and dragged him away from the interview cell. Stapleton further stated that Findley also made a shooting gesture at Stapleton and threatened Stapleton and his family. Stapleton requested that, for the duration of the trial, Findley be shackled at his hands and feet. Despite the district court's refusal to hear Findley's response, Findley persisted and accused Stapleton of lying about the incident and argued that Stapleton had not come to the prison at all. The district court ordered Findley shackled only at his feet during the trial. The jury was then brought in but was soon excused again, whereupon the judge noted for the record that Findley had deliberately extended his leg out beyond the table so that the jury could see that he was shackled. In the afternoon of the second day of trial, the district court ordered that Findley's shackles be removed.
 
 
 13
 After the government rested its case, Stapleton informed the court that Findley wished to testify on his own behalf but that Stapleton advised against it, given Findley's prior felony drug convictions and incriminating statements made by Findley during proffer sessions. Stapleton believed that Findley's testimony would not be truthful, and felt that he could not assist Findley should he choose to testify. Findley confirmed to the court that he wished to testify. The court advised Findley that, if he testified, he could be questioned about his prior conviction and that statements made at his proffer sessions would become admissible. Despite these warnings, Findley testified on his own behalf, primarily in narrative form, with Stapleton intermittently guiding Findley as to the dates of the alleged drug transactions and Findley's arrest as well as exhibits shown on monitors to the jury. As expected, the government cross-examined Findley, inquiring about Findley's prior felony conviction and statements made during proffer sessions.
 
 
 14
 Thereafter, the jury returned guilty verdicts on all counts. At sentencing, the district court granted Stapleton's motion to withdraw as counsel and continued Findley's sentencing hearing. In March 2000, Findley, represented by newly appointed counsel, was sentenced to 360 months imprisonment and ten years supervised release. Findley, through counsel, filed a timely notice of appeal.[3]
 
 II. DISCUSSION
 
 15
 On appeal, Findley argues that the district court abused its discretion in denying the numerous motions by both Stapleton and Findley to relieve Stapleton as trial counsel and appoint new counsel. Findley further contends that Stapleton "completely abandoned" Findley when he chose to exercise his right to testify on his own behalf as a consequence of the district court's refusal to substitute new counsel. Presumably, had Stapleton been permitted to withdraw and had new counsel been appointed, Findley would have received more active assistance in testifying. Findley also argues that the impaired relationship with Stapleton constituted a conflict of interest, such that he was denied effective assistance of counsel. Findley seeks reversal of his conviction and remand for a new trial.
 
 
 16
 The Sixth Amendment provides a criminal defendant the right to effective assistance of counsel. See U.S. Const. Amend. VI. This right to counsel "includes a right to conflict-free representation." Armienti v. United States, 234 F.3d 820, 823 (2d Cir. 2000) (quoting United States v. Rogers, 209 F.3d 139, 143 (2d Cir. 2000)). This right does not, however, guarantee a "meaningful relationship" between the defendant and his counsel. See Morris v. Slappy, 461 U.S. 1, 13-14 (1983).
 
 
 17
 Moreover, this Court has stated that, once trial has begun, a defendant has no "unbridled right to reject assigned counsel and demand another" and that courts must impose restraints on the right to reassignment of counsel in order to avoid the defendant's manipulation of the right "so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice." McKee v. Harris, 649 F.2d 927, 931 (2d Cir. 1981) (quoting United States v. Calabro, 467 F.2d 973, 986 (2d Cir. 1972) and United States v. Bentvena, 319 F.2d 916, 936 (2d Cir. 1963)).
 
 A. Substitution of Counsel
 
 18
 We review a district court's denial of a motion to substitute counsel for abuse of discretion. See United States v. Simeonov, 252 F.3d 238, 241 (2d Cir. 2001). This Court, following its sister circuits, applies a three factor test in evaluating whether a district court abused its discretion in denying a motion to substitute counsel: (1) whether defendant made a timely motion requesting new counsel; (2) whether the trial court adequately inquired into the matter; and (3) whether the conflict between the defendant and his attorney was so great that it resulted in a "total lack of communication preventing an adequate defense." See Simeonov, 252 F.3d at 241; see also United States v. Mullen, 32 F.3d 891, 895 (4th Cir. 1994); Bland v. Cal. Dep't of Corr., 20 F.3d 1469, 1475 (9th Cir. 1994); United States v. Allen, 789 F.2d 90, 92 (1st Cir. 1986).
 
 
 19
 The Tenth Circuit, however, has added a fourth factor to evaluate a district court's denial of a substitution motion: "whether the defendant substantially and unjustifiably contributed to the breakdown in communication." See Romero v. Furlong, 215 F.3d 1107, 1113 (10th Cir. 2000) (citing Brown v. Craven, 424 F.2d 1166, 1170 (9th Cir. 1970)). We have never explicitly applied the four-prong approach used in Romero, but we do so now. Therefore, we hold that, in evaluating a denial of a motion to substitute counsel, a defendant's own conduct contributing to the communication breakdown should be evaluated, in addition to the Simeonov factors. We find additional support for this holding in our decision in McKee, which rejected a purely subjective standard for assessing good cause warranting the appointment of new counsel, and stated that "a purely subjective standard would convert the requirement of good cause into an empty formality, since the defendant would be entitled to demand a reassignment of counsel simply on the basis of a breakdown in communication which he himself induced." McKee, 649 F.2d at 932 (emphasis added) (internal quotation marks omitted). Applying these four factors to this case, we believe that the district court acted within its discretion in denying the motions to substitute counsel, despite the evidence contained in the record that Findley and Stapleton were mired in a difficult attorney-client relationship and disagreed as to what was in Findley's best interests.
 
 
 20
 With respect to the first factor, the government does not dispute the timeliness of Findley's motions for substitution. We note, however, that the first formal motion was made by Stapleton just days before jury selection was to begin and all subsequent motions were made while the case was trial-ready or as trial was about to commence. Findley's only formal pro se motion, prepared while Findley was undergoing the competency examination, was made after the trial had been stayed pending the examination. Nonetheless, whether Findley's motion was timely made is but one of the four factors that this Court will apply and, even treating the motion as timely, application of the remaining three factors demonstrates that there was no abuse of discretion.
 
 
 21
 With regard to the second factor, this Court has held that "where a defendant voices a `seemingly substantial complaint about counsel,' the court should inquire into the reasons for dissatisfaction." McKee, 649 F.2d at 933 (quoting Calabro, 467 F.2d at 986); see also Simeonov, 252 F.3d at 241 ("When, for the first time, an accused makes known to the court in some way that he has a complaint about his counsel, the court must rule on the matter. If the reasons are made known to the court, the court may rule without more.") (citation and emphasis omitted). However, if the reasons proffered are insubstantial and the defendant receives competent representation from counsel, a court's failure to inquire sufficiently or to inquire at all constitutes harmless error. Cf. United States v. Morrissey, 461 F.2d 666, 670 (2d Cir. 1972).
 
 
 22
 A review of the record reveals that the district court conducted an inquiry into whether substitution was warranted. After Stapleton first requested to withdraw as counsel or, in the alternative, subject Findley to a competency examination, the district court heard from Stapleton about his reasons for seeking to withdraw and also heard from Findley before ordering the examination. Indeed, throughout the course of the proceedings, the district court inquired several times as to the relationship between Stapleton and Findley. The district court rejected Findley's claims that Stapleton was a "compulsive liar" and concluded that Findley would act in the same manner even if he were appointed new counsel. Specifically, the court held a hearing in response to Findley's pro se motion for substitution and determined that Findley's complaints about Stapleton's representation were not credible and that, in the court's view, Stapleton was a very competent criminal defense attorney. Here, the district court's inquiry was not merely a perfunctory, superficial inquiry to assess Findley's allegations against Stapleton, but instead was an inquiry detailed enough for the court to determine that substitution was unwarranted. As a reviewing court, we give strong deference to the district court's credibility determinations particularly where, as here, the court based its conclusions on such determinations. See United States v. Champion, 234 F.3d 106, 109 (2d Cir. 2000) (per curiam). Moreover, to the extent that the district court's inquiry in response to Stapleton's first request to withdraw was not as detailed as it could have been, the court did not err in ruling on the motion "without more," since Findley made known his reasons for wanting new counsel and the district court was in a position to rule on the motion.
 
 
 23
 With respect to the third factor, while the rift between Findley and Stapleton was at times intense as a result of Findley's violent and aggressive nature, the conflict between the two was not "`so great that it... resulted in total lack of communication preventing an adequate defense.'" Simeonov, 252 F.3d at 241 (quoting Morrissey, 461 F.2d at 670). The record reveals that Findley and Stapleton did communicate prior to and during the course of the trial. Even after the district court repeatedly denied his withdrawal motions and after Stapleton expressed fear for his own and his family's safety, Stapleton carried out his duties as Findley's counsel by, for example, (1) filing no less than nine motions in limine; (2) initially attempting to dissuade Findley from testifying, (3) arguing before the court, once Findley insisted on testifying, as to the admissibility of Findley's prior felony drug conviction, (4) cross-examining witnesses, and (5) making numerous objections to the government's questioning during the trial. Despite the conflict between Findley and Stapleton, it is clear that the two communicated in presenting Findley's defense. Further, the district court credited Stapleton's statements that he had given Findley the discovery provided by the Government, met with Findley to discuss strategy, and, despite the conflict, was willing to continue representing Findley during trial. Based on these facts, we cannot say that the conflict between Findley and Stapleton prevented an adequate defense.
 
 
 24
 Finally, we turn to whether Findley himself "substantially and unjustifiably contributed to the breakdown in communication" between him and Stapleton and whether the alleged irreconcilable differences can be largely attributed to Findley. Romero, 215 F.3d at 1113. A review of the record clearly indicates that Findley created most, if not all, of the problems with Stapleton by refusing to cooperate with him, acting aggressively, and making threatening gestures and remarks towards Stapleton. According to Stapleton, whom the district court credited, Findley's refusal to listen to Stapleton's reasoning concerning Findley's defense and his continuing violent behavior caused Stapleton to question whether he could work with Findley and to fear for his and his family's safety. Additionally, Findley's second attorney, who had been retained by Findley, requested and was permitted to withdraw, alleging that Findley had accused him of colluding with the Government and failing to communicate with Findley. Based on the representations of this attorney and Stapleton, it was eminently reasonable for the district court to conclude that Findley was the source of the breakdown in communications between Findley and Stapleton and therefore that substitution of new counsel was unlikely to solve the problem.
 
 
 25
 Thus, we conclude that the district court's denial was not an abuse of discretion, particularly in light of our examination of the fourth factor and our conclusion, based on the record, that Findley substantially and unjustifiably contributed to the conflict between himself and Stapleton.[4]
 
 B. Conflict of Interest
 
 26
 In conjunction with his challenge of the district court's refusal to substitute counsel, Findley also argues that he received ineffective assistance of counsel as a result of the conflict of interest that existed between him and Stapleton. This Court has delineated three levels of conflicts of interest in evaluating this type of Sixth Amendment claim: (1) a per se conflict requiring automatic reversal without a showing of prejudice; (2) an actual conflict of interest that carries a presumption of prejudice; and (3) a potential conflict of interest that requires a finding of both deficient performance by counsel and prejudice, under the standard established in Strickland v. Washington, 466 U.S. 668, 688 (1984). See Armienti, 234 F.3d at 823-24.
 
 
 27
 Findley contends that the district court's failure to grant the substitution motion upon an inquiry that revealed irreconcilable differences between him and Stapleton constitutes a per se violation of the Sixth Amendment. To the extent that Findley argues that this "per se violation" requires automatic reversal, the claim is without merit, as we have limited per se conflicts to two instances: (1) where trial counsel is not authorized to practice law or (2) where counsel is implicated in the crime for which the defendant is on trial. See Armienti, 234 F.3d at 823 (citing Solina v. United States, 709 F.2d 160, 164 (2d Cir. 1983), United States v. Cancilla, 725 F.2d 867, 870 (2d Cir. 1984) and Waterhouse v. Rodriguez, 848 F.2d 375, 383 (2d Cir. 1988)).
 
 
 28
 We also reject Findley's claim that there was an actual conflict of interest between him and Stapleton. Specifically, Findley contends that his alleged threats to Stapleton and his family created an actual conflict because Stapleton arguably would seek Findley's conviction and imprisonment in order to protect himself and his family. An actual conflict occurs "when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." Armienti, 234 F.3d at 824 (internal quotation marks omitted). While it is true that Findley and Stapleton disagreed as to certain aspects of Findley's defense, including whether Findley should testify, we adhere to this Court's previous conclusion that a defendant cannot establish an actual conflict of interest merely by "expressing dissatisfaction with [the] attorney's performance." United States v. Moree, 220 F.3d 65, 71 (2d Cir. 2000) (quoting United States v. White, 174 F.3d 290, 296 (2d Cir. 1999)). Moreover, we are persuaded by the government's contention that any threats made by Findley would actually cause Stapleton to do his best to obtain an acquittal, so that Findley would be placated and would not cause any harm to befall either Stapleton or his family. Additionally, we agree with the government that defining conduct of a threatening or violent nature as creating an actual conflict of interest would potentially encourage defendants to take such action in the hopes of having an avenue to later seek reversal of a conviction.
 
 
 29
 Finally, we find no potential conflict of interest between Findley and Stapleton warranting reversal. Under the standard established in Strickland, Findley must demonstrate that Stapleton's conduct fell below an objective standard of reasonableness and that, but for the deficient performance, the result of the trial would have been different. 466 U.S. 668, 688. To demonstrate Stapleton's deficient performance, Findley points to Stapleton's "complete abandonment" during Findley's testimony. We need not address this contention because, even assuming that Stapleton's conduct fell below an objective standard of reasonableness, we conclude that Findley cannot satisfy the prejudice prong of the Strickland standard in light of the overwhelming evidence presented at trial against Findley, in the form of the confidential informant's testimony and the taped telephone conversations. Moreover, Findley has not demonstrated that Stapleton's so-called "complete abandonment," which resulted in Findley's narrative testimony, prejudiced the outcome of his trial. Therefore, his claim of potential conflict of interest must fail.
 
 III. CONCLUSION
 
 30
 Based on our conclusion that the district court did not abuse its discretion in denying the motions to substitute counsel and that there was no conflict of interest rendering Stapleton's assistance ineffective under the Sixth Amendment, we AFFIRM the judgment of the district court.
 
 
 
 NOTES:
 
 
 [1]
 The anticipated plea agreement between Findley and the Government was never realized.
 
 
 [2]
 Following the district court's denial of the motion to withdraw, the parties commenced jury selection. At the end of this hearing, the government noted that, at one point during jury selection, Findley and Stapleton had been conferring quietly and that Findley was "calm, collected and appeared to be communicating effectively with Attorney Stapleton." J.A. at 86.
 
 
 [3]
 Shortly after filing Findley's notice of appeal, Findley's sentencing counsel withdrew and Findley was appointed yet another attorney.
 
 
 [4]
 Both parties submitted a letter pursuant to Federal Rule of Appellate Procedure 28(j), bringing to our attention this Court's recent decision in Gilchrist v. O'Keefe, 260 F.3d 87 (2d Cir. Aug. 2, 2001). Gilchrist, a habeas corpus appeal, evaluated a state court's decision to grant trial counsel's motion to withdraw and to refuse to appoint new counsel based on the petitioner's violent conduct toward his attorney. Gilchrist, 260 F.3d at 89-91. We noted that
 had this been a direct appeal from a federal conviction we might well have agreed with petitioner that the constitutional interests protected by the right to counsel prohibit a finding that a defendant forfeits that right based on a single incident, where there were no warnings that a loss of counsel could result from such misbehavior, where there was no evidence that such action was taken to manipulate the court or delay proceedings, and where it was possible that other measures short of outright denial of counsel could have been taken to protect the safety of counsel.
 Id. at 89. Ultimately, this Court concluded that the state court's action was neither contrary to or an unreasonable application of clearly established federal law, and affirmed the denial of the habeas petition. See id. at 100.
 Here, we do have a direct appeal from a federal conviction, but because of important factual distinctions, we conclude that Gilchrist is inapposite. First, and most importantly, the district court here did not force Findley to proceed pro se, which would have completely deprived him of any assistance of counsel. Instead, Stapleton continued on as counsel, and, as we conclude, provided effective assistance. Second, the district court here, after several inquiries and pursuant to its course of dealings with Findley, expressly found Findley to be manipulative.